FILED
CLERK, U.S. DISTRICT COURT

4/13/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: ___JB___ DEPUTY

1  TRACY L. WILKISON
   Acting United States Attorney
2  BRANDON D. FOX
   Assistant United States Attorney
3  Chief, Criminal Division
   ERIK M. SILBER (Cal. Bar No. 190534)
4  AMANDA M. BETTINELLI (Cal. Bar No. 233927)
   Assistant United States Attorneys
5  Environmental and Community Safety Crimes Section
        1300 United States Courthouse
6       312 North Spring Street
        Los Angeles, California 90012
7       Telephone: (213) 894-2231/0470
        Facsimile: (213) 894-8513
8       E-mail:    Erik.Silber@usdoj.gov
                   Amanda.Bettinelli@usdoj.gov
9
   Attorneys for Plaintiff
10 UNITED STATES OF AMERICA

11                  UNITED STATES DISTRICT COURT

12             FOR THE CENTRAL DISTRICT OF CALIFORNIA

13 UNITED STATES OF AMERICA,        No. CR 21-  2:21-cr-00179-FMO

14            Plaintiff,            PLEA AGREEMENT FOR DEFENDANT
                                    ATANACIO VILLEGAS
15            v.

16 ATANACIO VILLEGAS,
     aka "A.T.,"
17
              Defendant.
18

19

20      1.   This constitutes the plea agreement between defendant

21 ATANACIO VILLEGAS, also known as "A.T." ("defendant"), and the United

22 States Attorney's Office for the Central District of California (the

23 "USAO").  This agreement is limited to the USAO and cannot bind any

24 other federal, state, local, or foreign prosecuting, enforcement,

25 administrative, or regulatory authorities.

26                    DEFENDANT'S OBLIGATIONS

27      2.   Defendant agrees to:

28

1          a.    Give up the right to indictment by a grand jury and,

2    at the earliest opportunity requested by the USAO and provided by the

3    Court, appear and plead guilty to count one of the information in the

4    form attached to this agreement as Exhibit A or a substantially

5    similar form, which charges defendant with mail fraud in violation of

6    18 U.S.C. §§ 1341, 1346, 2(b).

7          b.    Agree that all court appearances, including his change

8    of plea hearing and sentencing hearing, may proceed by video-

9    teleconference ("VTC") or telephone, if VTC is not reasonably

10   available, so long as such appearances are authorized by Order of the

11   Chief Judge or another order, rule, or statute.  Defendant

12   understands that, under the United States Constitution, the United

13   States Code, and the Federal Rules of Criminal Procedure (including

14   Rules 11, 32, and 43), he may have the right to be physically present

15   at these hearings.  Defendant understands that right and, after

16   consulting with counsel, voluntarily agrees to waive it and to

17   proceed remotely.  Defense counsel also joins in this consent,

18   agreement, and waiver.  Specifically, this agreement includes, but is

19   not limited to, the following:

20               i. Defendant consents under Federal Rules of Criminal

21   Procedure 5(f) and 10(c) and Section 15002(b) of the CARES Act to

22   proceed with his initial appearance and arraignment by VTC or

23   telephone, if VTC is not reasonably available.

24               ii. Defendant consents under Section 15002(b) of the

25   CARES Act to proceed with his waiver of indictment, under Federal

26   Rule of Criminal Procedure 7(b), by VTC or telephone, if VTC is not

27   reasonably available.

28

iii. Defendant consents under Section 15002(b) of the CARES Act to proceed with his change of plea hearing by VTC or telephone, if VTC is not reasonably available.

iv. Defendant consents under Section 15002(b) of the CARES Act to proceed with his sentencing hearing by VTC or telephone, if VTC is not reasonably available.

v. Defendant consents under 18 U.S.C. § 3148 and Section 15002(b) of the CARES Act to proceed with any hearing regarding alleged violations of the conditions of pretrial release by VTC or telephone, if VTC is not reasonably available.

c. Not contest facts agreed to in this agreement.

d. Abide by all agreements regarding sentencing contained in this agreement.

e. Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

f. Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

g. Be truthful at all times with the United States Probation and Pretrial Services Office and the Court.

h. Pay the applicable special assessment at or before the time of sentencing unless defendant has demonstrated a lack of ability to pay such assessments.

<u>THE USAO'S OBLIGATIONS</u>

3. The USAO agrees to:

a. Not contest facts agreed to in this agreement.

3

1      b.    Abide by all agreements regarding sentencing contained
2  in this agreement.
3      c.    At the time of sentencing, provided that defendant
4  demonstrates an acceptance of responsibility for the offense up to
5  and including the time of sentencing, recommend a two-level reduction
6  in the applicable Sentencing Guidelines offense level, pursuant to
7  U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an
8  additional one-level reduction if available under that section.
9      d.    Because the justice system is facing an unprecedented
10 crisis through the backlog of cases, the parties agree that the
11 defendant is entitled to a two-level variance, and the government
12 agrees to request a two-level variance if defendant complies with
13 paragraph 2 above, as recognition of defendant's early acceptance of
14 responsibility, which will lessen the burden on the court system by:
15 (1) waiving any right to presence and pleading guilty at the earliest
16 opportunity by VTC (or telephone, if VTC is not reasonably
17 available); (2) waiving any right to presence and agreeing to be
18 sentenced by VTC (or telephone, if VTC is not reasonably available)
19 should the Central District of California's General Order allow for
20 it; (3) agreeing to appear at all other times by VTC or telephone;
21 and (4) waiving all appellate rights.
22     e.    Recommend that defendant be sentenced to a term of
23 imprisonment no higher than the low end of the applicable Sentencing
24 Guidelines range.  For purposes of this agreement, the low end of the
25 Sentencing Guidelines range is that defined by the Sentencing Table
26 in U.S.S.G. Chapter 5, Part A, without regard to reductions in the
27 term of imprisonment that may be permissible through the substitution
28

1  of community confinement or home detention as a result of the offense

2  level falling within Zone B or Zone C of the Sentencing Table.

3       f.   Should the Court sentence defendant to a term of

4  imprisonment, recommend that defendant not be required to self-

5  surrender to serve his sentence until on or after February 1, 2021,

6  unless defendant violates the conditions of his bond.

7                         NATURE OF THE OFFENSE

8       4.   Defendant understands that for defendant to be guilty of

9  mail fraud, in violation of 18 U.S.C. §§ 1341, 1346, 2(b) the

10 following must be true: (1) defendant devised or knowingly

11 participated in a scheme or plan to deprive the California Department

12 of Motor Vehicles of its right to honest services; (2) the scheme or

13 plan consists of a bribe in exchange for defendant's services, and

14 the "exchange" may be express or may be implied from all the

15 surrounding circumstances; (3) defendant owed a fiduciary duty to the

16 California Department of Motor Vehicles; (4) defendant acted with the

17 intent to defraud by depriving the California Department of Motor

18 Vehicles of its right to honest services; (5) defendant's act was

19 material, that is, it had a natural tendency to influence, or was

20 capable of influencing, an entity's acts; and (6) defendant used, or

21 caused someone to use, the mails to carry out or to attempt to carry

22 out the scheme or plan.

23                              PENALTIES

24      5.   Defendant understands that the statutory maximum sentence

25 that the Court can impose for a violation of 18 U.S.C. §§ 1341, 1346,

26 2(b) is: 20 years imprisonment; a three-year period of supervised

27 release; a fine of $250,000 or twice the gross gain or gross loss

28

1 resulting from the offense, whichever is greatest; and a mandatory
2 special assessment of $100.

3     6.   Defendant understands that supervised release is a period
4 of time following imprisonment during which defendant will be subject
5 to various restrictions and requirements.  Defendant understands that
6 if defendant violates one or more of the conditions of any supervised
7 release imposed, defendant may be returned to prison for all or part
8 of the term of supervised release authorized by statute for the
9 offense that resulted in the term of supervised release, which could
10 result in defendant serving a total term of imprisonment greater than
11 the statutory maximum stated above.

12     7.   Defendant understands that, by pleading guilty, defendant
13 may be giving up valuable government benefits and valuable civic
14 rights, such as the right to vote, the right to possess a firearm,
15 the right to hold office, and the right to serve on a jury.
16 Defendant understands that he is pleading guilty to a felony and that
17 it is a federal crime for a convicted felon to possess a firearm or
18 ammunition.  Defendant understands that the conviction in this case
19 may also subject defendant to various other collateral consequences,
20 including but not limited to revocation of probation, parole, or
21 supervised release in another case and suspension or revocation of a
22 professional license.  Defendant understands that unanticipated
23 collateral consequences will not serve as grounds to withdraw
24 defendant's guilty plea.

25     8.   Defendant understands that, if defendant is not a United
26 States citizen, the felony conviction in this case may subject
27 defendant to: removal, also known as deportation, which may, under
28 some circumstances, be mandatory; denial of citizenship; and denial

of admission to the United States in the future.  The Court cannot, and defendant's attorney also may not be able to, advise defendant fully regarding the immigration consequences of the felony conviction in this case.  Defendant understands that unexpected immigration consequences will not serve as grounds to withdraw defendant's guilty plea.

FACTUAL BASIS

9.    Defendant admits that defendant is, in fact, guilty of the offense to which defendant is agreeing to plead guilty.  Defendant and the USAO agree to the statement of facts provided below and agree that this statement of facts is sufficient to support a plea of guilty to the charge described in this agreement and to establish the Sentencing Guidelines factors set forth in paragraph 11 below but is not meant to be a complete recitation of all facts relevant to the underlying criminal conduct or all facts known to either party that relate to that conduct.

Defendant was a California Department of Motor Vehicles ("California DMV") employee who began working for the California DMV on or about October 2, 2000, and resigned on or about June 19, 2017. From on or about February 1, 2010, to on or about September 1, 2016, defendant VILLEGAS worked as a License Registration Examiner in the Torrance office of the California DMV.  From on or about September 1, 2016, until he resigned, defendant VILLEGAS worked at the Gardena Commercial Driver License Processing Center.  Through his position as a License Registration Examiner for the California DMV, defendant was an agent of the State of California and owed a fiduciary duty to the California Department of Motor Vehicles and the people of the State of California.

1    Defendant used his position to accept cash bribes and to arrange
2    for other DMV employees to likewise accept cash bribes to alter DMV
3    records and illegally issue instructional permits and driver's
4    licenses to otherwise ineligible California DMV applicants, and to
5    fraudulently enter passing scores for applicants for the tests
6    legally required for issuance of licenses and permits, without the
7    applicant actually taking or passing the necessary tests.  Defendant
8    communicated with the corrupt DMV employees working at his direction
9    via text messages using coded language to indicate the type of
10   driver's license to be altered (i.e., "one scoop" for a Class C
11   license or "apple" for a Class A license), and provided personal
12   identifiers for fraudulent applicants sent to a corrupt DMV
13   employee's service window (i.e., wearing a red hat).  Defendant paid
14   corrupt DMV employees working at his direction in cash and often
15   placed cash payments in manila envelopes in the DMV employees'
16   lockers.  He then, in turn, received payments from brokers for
17   arranging the fraudulent transactions.

18        For example, on or before March 23, 2015, defendant asked DMV
19   Employee 1 to enter a passing score for driver's license applicant
20   I.S.R. on tests for an instructional permit without the applicant
21   taking or passing the tests required for an instructional permit.  An
22   instructional permit is a prerequisite to obtaining a driver's
23   license and requires passing a written test demonstrating an
24   applicant's knowledge of the rules of driving on California's public
25   roadways.  Defendant agreed to pay DMV Employee 1 cash to
26   fraudulently enter passing scores on the tests for an instructional
27   permit, including the written test.  On or about March 23, 2015, DMV
28   computer records indicate that DMV Employee 1 entered passing scores

on tests required to obtain an instructional permit (signs test and Class C law test) and then issued an instructional permit to I.S.R., even though I.S.R. did not actually take or pass those tests. In fact, I.S.R. never even went to the Torrance DMV office where DMV Employee 1 worked. After DMV Employee 1 fraudulently entered the passing test score, defendant paid her a cash bribe, which defendant placed inside her DMV locker. Defendant then received a cash bribe from a broker for arranging for the issuance of the fraudulent instructional permit and fraudulent driver's license. The DMV mailed I.S.R. a driver's license on or about April 15, 2015.

On or before March 23, 2015, defendant also asked DMV Employee 1 to enter a passing score for driver's license applicant R.H.B. on tests for an instructional permit without R.H.B. taking or passing any tests. Defendant agreed to pay DMV Employee 1 cash to fraudulently enter passing scores for tests that R.H.B. never took or passed. On or about March 23, 2015, DMV computer records indicate that DMV Employee 1 entered passing scores on tests required for an instructional permit (signs test and Class C Law test) and then issued an instructional permit for R.H.B. even though R.H.B. did not take or pass those tests. In fact, R.H.B. never even went to the Torrance DMV office where DMV Employee 1 worked. After DMV Employee 1 fraudulently entered the passing test scores, defendant paid her in cash, which he placed inside her DMV locker. Defendant then received a cash payment from a broker for arranging for R.H.B's fraudulent instructional permit (and ultimately a fraudulent driver's license). The DMV mailed R.H.B. a driver's license sometime before January 19, 2016.

On or before June 23, 2015, defendant asked DMV Employee 2 to pass a driver's license applicant, J.L.A.V., on tests for an instructional permit without J.L.A.V. taking or passing those tests. Defendant agreed to pay DMV Employee 2 cash to fraudulently enter passing test scores.  On June 23, 2015, DMV computer records indicate that DMV Employee 2 entered passing scores for the Spanish law test (the written test in Spanish) and signs test and issued a Class C instructional permit to J.L.A.V., even though J.L.A.V. did not actually take or pass the required tests.  After DMV Employee 2 fraudulently entered the passing test scores, defendant paid her cash, which he placed inside her DMV locker.  Defendant then received a cash payment from a broker for arranging the fraudulently obtained driver's licenses.

On or before June 25, 2016, defendant asked DMV Employee 3 to pass driver's license applicant J.L.A.V. on the drive test for a driver's license without J.L.A.V. taking or passing the required drive test.  Defendant agreed to pay DMV Employee 3 cash to fraudulently enter that passing score.  On or about June 25, 2015, DMV computer records show that DMV Employee 3 entered a passing score for the drive test, identifed defendant as the drive test examiner, and issued an interim driver's license, even though J.L.A.V. did not take or pass the drive test.  After DMV Employee 3 fraudulently entered the passing test score, defendant paid him cash, which he placed inside his DMV locker.  Defendant then received a cash payment from a broker for arranging the fraudulently obtained driver's licenses.

On or before June 23, 2015, defendant asked DMV Employee 3 to pass driver's license applicant R.S. on tests for a driver's license

10

without R.S. taking or passing the required tests.  Defendant agreed to pay DMV Employee 3 cash to fraudulently enter those passing test scores.  On or about June 23, 2015, DMV computer records indicate that DMV Employee 3 entered a passing score for the vision and Spanish law test for R.S. and waived the drive test, thereby issuing R.S. an interim driver's license without R.S. actually taking or passing the required tests.  After DMV Employee 3 fraudulently entered the passing test scores (and fraudulently waived the drive test), defendant paid him cash, which defendant placed inside the locker of DMV Employee 3.  Defendant then received a cash payment from a broker for arranging the fraudulently obtained driver's licenses.  On July 6, 2015, the DMV mailed the driver's license to R.S.

On or before June 23, 2015, defendant asked DMV Employee 2 to pass driver's license applicant A.L.E.G. on tests for a driver's license without A.L.E.G. taking or passing the required tests. Defendant agreed to pay DMV Employee 2 cash to fraudulently enter those passing test scores.  On or about June 23, 2015, DMV records indicate that DMV Employee 2 entered passing scores on the signs and Spanish law test and issued A.L.E.G. an instructional permit without A.L.E.G. actually taking or passing the required tests.  After DMV Employee 2 fraudulently entered the passing test scores, defendant paid her cash, which he placed inside her DMV locker.  Defendant then received a cash payment from a broker for arranging the fraudulent instructional permit (and ultimately a fraudulent driver's license).

On or before June 25, 2015, defendant asked DMV Employee 3 to pass driver's license applicant M.B. on tests for a driver's license without M.B. taking or passing the required tests.  Defendant agreed

1   to pay DMV Employee 3 cash to fraudulently enter those passing test

2   scores.  On or about June 25, 2015, DMV computer records indicate

3   that DMV Employee 3 entered passing scores for the signs test and law

4   test and issued an instructional permit to M.B. without M.B. actually

5   taking or passing the required tests.  After DMV Employee 3

6   fraudulently entered the passing test scores, defendant paid DMV

7   Employee 3 cash, which defendant placed inside his DMV locker.  On or

8   before July 9, 2015, defendant asked DMV Employee 2 to pass driver's

9   license applicant M.B. on the drive test for a driver's license

10  without the applicant taking or passing the drive test.  Defendant

11  agreed to pay DMV Employee 2 cash to fraudulently enter that passing

12  test score.  On or about July 9, 2015, DMV records show that DMV

13  Employee 2 entered passing scores on the pre-trip test and a

14  commercial drive test, entered defendant's name as the drive

15  instructor, and issued M.B. a Class A interim driver's license

16  without M.B. actually taking or passing the drive test.  After DMV

17  Employee 2 fraudulently entered the passing test scores, defendant

18  paid her cash, which he placed inside her DMV locker.  Defendant then

19  received a cash payment from a broker for arranging the fraudulent

20  driver's license.  The DMV then mailed the driver's license to M.B.

21  on July 22, 2015.

22       On or before June 26, 2015, defendant asked DMV Employee 3 to

23  pass driver's license applicant E.V.H. on tests for a driver's

24  license without E.V.H. taking or passing the required tests.

25  Defendant agreed to pay DMV Employee 3 cash to fraudulently enter

26  those passing test scores.  On or about June 26, 2015, DMV computer

27  records indicate that DMV Employee 3 entered passing scores on tests

28  required for an instructional permit (law/written test and signs

test) and then issued an instructional permit for E.V.H. without E.V.H. taking or passing the required tests.  After DMV Employee 3 fraudulently entered the passing test scores, defendant paid DMV Employee 3 cash, which defendant placed inside his DMV locker.  On or before July 9, 2015, defendant asked DMV Employee 2 to pass driver's license applicant E.V.H. on the drive test for a driver's license without the applicant taking or passing the drive test.  Defendant agreed to pay DMV Employee 2 cash to fraudulently enter that passing test score.  On or about July 9, 2015, DMV records show that DMV Employee 2 entered a passing score for a Class C drive test, entered defendant as the person giving the test, and then issued an interim driver's license to E.V.H. without E.V.H. taking or passing the drive test.  After DMV Employee 2 fraudulently entered the passing test scores, defendant paid DMV Employee 2 cash, which defendant placed inside her DMV locker.  Defendant then received a cash payment from brokers for arranging the fraudulent driver's license.  The DMV mailed the driver's license to E.V.H. on July 22, 2015.

On or about June 26, 2015, defendant asked DMV Employee 3 to pass driver's license applicant J.F.B.C. on tests for a driver's license without J.F.B.C. taking or passing the required tests. Defendant agreed to pay DMV Employee 3 cash to fraudulently enter those passing test scores.  On or about June 26, 2015, DMV computer records indicate that DMV Employee 3 entered passing scores for the Class A drive test (a commercial drive test), entered defendant as the drive test instructor, and issued an interim Class A driver's license.  After DMV Employee 3 fraudulently entered the passing test scores, defendant paid DMV Employee 3 cash, which defendant placed inside his DMV locker.  Defendant received a $500 cash payment

13

1  directly from DMV applicant J.F.B.C. to obtain the fraudulently

2  issued driver's license.

3      On or before March 3, 2016, defendant asked DMV Employee 1 to

4  pass driver's license applicant L.O.V.G. on tests for a driver's

5  license without L.O.V.G. taking or passing the required tests.

6  Defendant agreed to pay DMV Employee 1 cash to fraudulently enter

7  those passing test scores.  Employee 1, in turn, sub-contracted her

8  work and got a different DMV employee (DMV Employee 4) to enter the

9  fraudulent tests scores in exchange for at least a portion of the

10 money from defendant.  On or about March 3, 2016, DMV computer

11 records indicate that DMV Employee 4 entered passing scores on tests

12 required for an instructional permit (law/written test and signs

13 test) and then issued an instructional permit for L.O.V.G. without

14 L.O.V.G. taking or passing the required tests.  After DMV Employee 4

15 fraudulently entered the passing test scores, defendant paid DMV

16 Employee 1 cash (that DMV employee then paid at least a portion of

17 that cash payment to DMV Employee 4).  Defendant then received a cash

18 payment from a broker for arranging the fraudulent instructional

19 permit and ultimately a driver's license.  The DMV ultimately mailed

20 a driver's license to L.O.V.G. on or before April 14, 2016.

21     On or before April 7, 2016, defendant asked DMV Employee 1 to

22 pass driver's license applicant R.H., the son of R.H.B., on tests for

23 a driver's license without R.H. taking or passing the required tests.

24 Defendant agreed to pay DMV Employee 1 cash to fraudulently enter

25 those passing test scores.  DMV Employee 1, in turn, sub-contracted

26 her work and got DMV Employee 4 to enter the fraudulent tests scores

27 in exchange for at least a portion of the cash bribery payment from

28 defendant.  On or about April 7, 2016, DMV computer records indicate

1  that DMV Employee 4 entered passing scores on a test required for an

2  instructional permit (law/written test) and then issued an

3  instructional permit for R.H.  After DMV Employee 4 fraudulently

4  entered the passing test scores, defendant paid DMV Employee 1 cash.

5  DMV Employee 1 then paid at least a portion of the cash bribe

6  received from defendant to DMV Employee 4.  Defendant then received a

7  cash payment from a broker for arranging the fraudulent instructional

8  permit and ultimately a driver's license.  The DMV mailed the

9  driver's license to R.H. on November 10, 2016.

10      On or before May 5, 2016, defendant asked DMV Employee 2 to

11  enter a passing score for a driver's license applicant who,

12  unbeknownst to him, was an undercover officer.  As on prior

13  occasions, defendant knew that the applicant (undercover officer)

14  would not actually take the tests required.  Defendant agreed to pay

15  DMV Employee 2 cash to fraudulently enter those passing test scores.

16  On or about May 5, 2016, DMV Employee 2 accessed the account for the

17  undercover officer, entered a passing score on the Class C law test,

18  and issued a driving permit without the applicant taking or passing

19  the required tests.  The undercover officer paid a broker $1,000 for

20  the fraudulent transaction.  After DMV Employee 2 fraudulently

21  entered the passing test scores, defendant paid DMV Employee 2 cash

22  by placing it in her DMV locker.  Defendant then received a cash

23  payment from a broker for arranging the fraudulent instructional

24  permit.

25      On or about May 18, 2016, DMV computer records indicate that

26  defendant accessed the record for applicant G.F.M., updated the

27  record from a Class B to a Class A license, entered a passing score

28  on the Class A written test, and issued an instructional permit,

without G.F.M. actually taking or passing the necessary tests.
Defendant fraudulently entered those passing scores as a result of
obtaining a cash bribe to do so by brokers.  On or before June 14,
2016, defendant asked a DMV employee, DMV Employee 5, to pass
driver's license applicant G.F.M. on the drive test for a driver's
license without G.F.M. taking or passing the drive test.  Defendant
agreed to pay DMV Employee 5 cash to fraudulently enter those passing
test scores.  On June 14, 2016, DMV computer records indicate that
that DMV Employee 5 accessed the record, entered a passing score for
the Class A pre-trip and drive test, entered defendant as the drive
test examiner, and issued an interim driver's license without G.F.M.
actually taking or passing the drive test.  After DMV Employee 5
fraudulently entered the passing test scores, defendant paid her
cash, which he placed inside her DMV locker.  Defendant then received
a cash payment from a broker for arranging the fraudulent driver's
license.  On November 22, 2016, the DMV mailed a driver's license to
G.F.M.

On or before May 25, 2016, defendant asked DMV employee 1 to
pass driver's license applicant K.C. on tests for a driver's license
without the applicant taking or passing the tests required to do so.
Defendant agreed to pay DMV Employee 1 cash to fraudulently enter
those passing test scores.  As on prior occasions, DMV Employee 1, in
turn, sub-contracted the work and got DMV Employee 4 to enter the
fraudulent tests scores in exchange for at least a portion of the
cash bribe received from defendant.  On or about May 25, 2016, DMV
computer records indicate that the DMV Employee 4 entered passing
scores on a test required for an instructional permit (law/written
test) and then issued an instructional permit without K.C. actually

taking or passing the required tests.  After DMV Employee 4
fraudulently entered the passing test scores, defendant paid DMV
Employee 1 cash and she then paid at least a portion of that cash
bribery payment to DMV Employee 4.  Defendant then received a cash
payment from a broker for arranging the fraudulent instructional
permit and ultimately driver's license.

On or before July 21, 2016, defendant asked DMV Employee 3 to
fraudulently add a hazardous materials ("hazmat") endorsement to an
applicant's commercial truck driver's license who, unbeknownst to
defendant, was a confidential informant.  As on prior occasions,
defendant made the arrangement with DMV Employee 3 knowing that the
hazmat endorsement would be added to the commercial driver's license
with the applicant actually taking or passing the tests required to
do so.  Defendant agreed to pay DMV Employee 3 cash to fraudulently
enter those passing test scores.  On or about July 21, 2016, the
confidential informant paid a broker $3,000 to fraudulently acquire
the hazmat endorsement.  On July 21, 2016, DMV Employee 3 added a
hazmat endorsement and waived all required tests.  DMV Employee 3
entered a manager at the branch as the drive test examiner and then
issued a Class A driver's license with the endorsement.  After DMV
Employee 3 fraudulently entering the passing test scores, defendant
paid him cash by placing it in his DMV locker.  Defendant then
received a cash payment from a broker for arranging the fraudulent
hazmat endorsement.

On or before October 11, 2016, defendant asked DMV Employee 5 to
fraudulently pass an applicant who, unbeknownst to defendant, was a
confidential informant, on tests for an instructional permit without
the applicant taking or passing the required tests.  Defendant agreed

17

to pay DMV Employee 5 cash to fraudulently enter those passing test scores.  On or about October 11, 2016, DMV Employee 5 entered passing scores for the instructional permit and issued it without the confidential informant taking or passing the required tests.  After DMV Employee 5 fraudulently entered the passing test scores, defendant paid her cash by placing it in her DMV locker.  Defendant then received a cash payment from a broker for arranging the fraudulent instructional permit.

On or before December 19, 2016, defendant asked DMV Employee 5 to pass driver's license applicant D.E.P.H. on tests for a driver's license without D.E.P.H. taking or passing the required tests. Defendant agreed to pay DMV Employee 5 cash to fraudulently enter those passing test scores.  On or about December 19, 2016, DMV computer records indicate that DMV Employee 5 entered passing scores on a Class C Spanish law test (written test), and issued an instructional permit, without that applicant taking or passing the required tests.  After DMV Employee 5 fraudulently entered the passing test scores, defendant paid her cash by placing money inside her DMV locker.  Defendant then received a cash payment from a broker for arranging the fraudulent instructional permit (and ultimately a fraudulent driver's license).  The DMV mailed a driver's license to D.E.P.H. on February 13, 2017.

On or before January 19, 2017, defendant asked DMV Employee 5 to pass driver's license applicant T.G.G. on tests for a driver's license without T.G.G. taking or passing the required tests. Defendant agreed to pay the DMV Employee 5 cash to fraudulently enter those passing test scores.  On or about January 19, 2017, DMV computer records indicate that DMV Employee 5 entered a passing score

on the Class C law test (written test), signs test, and issued an
instructional permit without the applicant taking or passing those
tests.  After DMV Employee 5 fraudulently entered the passing test
scores, defendant paid her cash by placing money inside her DMV
locker.  Defendant then received a cash payment from a broker for
arranging the fraudulent instructional permit (and ultimately the
fraudulent driver's license).  The DMV ultimately mailed a driver's
license to T.G.G. on February 17, 2017.

<u>SENTENCING FACTORS</u>

10.  Defendant understands that in determining defendant's
sentence the Court is required to calculate the applicable Sentencing
Guidelines range and to consider that range, possible departures
under the Sentencing Guidelines, and the other sentencing factors set
forth in 18 U.S.C. § 3553(a).  Defendant understands that the
Sentencing Guidelines are advisory only, that defendant cannot have
any expectation of receiving a sentence within the calculated
Sentencing Guidelines range, and that after considering the
Sentencing Guidelines and the other § 3553(a) factors, the Court will
be free to exercise its discretion to impose any sentence it finds
appropriate up to the maximum set by statute for the crime of
conviction.

11.  Defendant and the USAO agree to the following applicable
Sentencing Guidelines factors:

| | | |
|---|---|---|
| Base Offense Level: | 14 | U.S.S.G. § 2C1.1(a)(1) |
| More than One Bribe: | +2 | U.S.S.G. § 2C1.1(b)(1) |
| Identification Document: | +2 | U.S.S.G. § 2C1.1(b)(4) |

Defendant and the USAO reserve the right to argue that additional
specific offense characteristics, adjustments, and departures under

19

the Sentencing Guidelines are appropriate, including an enhancement for value of the bribes under U.S.S.G. § 2C1.1(b)(2), an enhancement because the offense involved a sensitive position under U.S.S.G. § 2C1.1(b)(3), and an enhancement for an aggravating role under U.S.S.G. § 3B1.1.

12.   Defendant understands that there is no agreement as to defendant's criminal history or criminal history category.

<u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

13.   Defendant understands that by pleading guilty, defendant gives up the following rights:

      a.   The right to persist in a plea of not guilty.

      b.   The right to a speedy and public trial by jury.

      c.   The right to be represented by counsel – and if necessary have the Court appoint counsel - at trial.  Defendant understands, however, that, defendant retains the right to be represented by counsel – and if necessary have the Court appoint counsel – at every other stage of the proceeding.

      d.   The right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

      e.   The right to confront and cross-examine witnesses against defendant.

      f.   The right to testify and to present evidence in opposition to the charges, including the right to compel the attendance of witnesses to testify.

      g.   The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

        h.    Any and all rights to pursue any affirmative defenses,

Fourth Amendment or Fifth Amendment claims, and other pretrial

motions that have been filed or could be filed.

WAIVER OF APPEAL OF CONVICTION

    14.   Defendant understands that, with the exception of an appeal

based on a claim that defendant's guilty plea was involuntary, by

pleading guilty defendant is waiving and giving up any right to

appeal defendant's conviction on the offense to which defendant is

pleading guilty.  Defendant understands that this waiver includes,

but is not limited to, arguments that the statute to which defendant

is pleading guilty is unconstitutional, and any and all claims that

the statement of facts provided herein is insufficient to support

defendant's plea of guilty.

LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE

    15.   Defendant gives up the right to appeal all of the

following: (a) the procedures and calculations used to determine and

impose any portion of the sentence; (b) the term of imprisonment

imposed by the Court; (c) the fine imposed by the Court, provided it

is within the statutory maximum; (d) to the extent permitted by law,

the constitutionality or legality of defendant's sentence, provided

it is within the statutory maximum; (e) the amount and terms of any

restitution order; (f) the term of probation or supervised release

imposed by the Court, provided it is within the statutory maximum;

and (g) any of the following conditions of probation or supervised

release imposed by the Court: the conditions set forth in General

Order 20-04 of this Court; the drug testing conditions mandated by 18

U.S.C. §§ 3563(a)(5) and 3583(d); and the alcohol and drug use

conditions authorized by 18 U.S.C. § 3563(b)(7).

16.   Defendant also gives up any right to bring a postconviction collateral attack on the conviction or sentence, including any order of restitution, except a post-conviction collateral attack based on a claim of ineffective assistance of counsel or an explicitly retroactive change in the applicable Sentencing Guidelines, sentencing statutes, or statutes of conviction.  Defendant understands that this waiver includes, but is not limited to, arguments that the statute to which defendant is pleading guilty is unconstitutional, that newly discovered evidence purportedly supports defendant's innocence, and any and all claims that the statement of facts provided herein is insufficient to support defendant's plea of guilty.

17.   The USAO agrees that, provided (a) all portions of the sentence are at or below the statutory maximum specified above and (b) the Court imposes a term of imprisonment of no less than 41 months in prison, the USAO gives up its right to appeal any portion of the sentence.

<u>RESULT OF WITHDRAWAL OF GUILTY PLEA</u>

18.   Defendant agrees that if, after entering a guilty plea pursuant to this agreement, defendant seeks to withdraw and succeeds in withdrawing defendant's guilty plea on any basis other than a claim and finding that entry into this plea agreement was involuntary, then (a) the USAO will be relieved of all of its obligations under this agreement; and (b) should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then (i) any applicable statute of limitations will be tolled between the date of defendant's signing of this agreement and the filing commencing any such action; and

(ii) defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

EFFECTIVE DATE OF AGREEMENT

19.  This agreement is effective upon signature and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney.

BREACH OF AGREEMENT

20.  Defendant agrees that if defendant, at any time after the signature of this agreement and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached.  All of defendant's obligations are material, a single breach of this agreement is sufficient for the USAO to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the USAO in writing. If the USAO declares this agreement breached, and the Court finds such a breach to have occurred, then: (a) if defendant has previously entered a guilty plea pursuant to this agreement, defendant will not be able to withdraw the guilty plea, and (b) the USAO will be relieved of all its obligations under this agreement.

21.  Following the Court's finding of a knowing breach of this agreement by defendant, should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then:

a.    Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the filing commencing any such action.

b.    Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

c.    Defendant agrees that: (i) any statements made by defendant, under oath, at the guilty plea hearing (if such a hearing occurred prior to the breach); (ii) the agreed to factual basis statement in this agreement; and (iii) any evidence derived from such statements, shall be admissible against defendant in any such action against defendant, and defendant waives and gives up any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that the statements or any evidence derived from the statements should be suppressed or are inadmissible.

## COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES OFFICE NOT PARTIES

22.    Defendant understands that the Court and the United States Probation and Pretrial Services Office are not parties to this agreement and need not accept any of the USAO's sentencing recommendations or the parties' agreements to facts or sentencing factors.

23.    Defendant understands that both defendant and the USAO are free to: (a) supplement the facts by supplying relevant information

24

to the United States Probation and Pretrial Services Office and the Court, (b) correct any and all factual misstatements relating to the Court's Sentencing Guidelines calculations and determination of sentence, and (c) argue on appeal and collateral review that the Court's Sentencing Guidelines calculations and the sentence it chooses to impose are not error, although each party agrees to maintain its view that the calculations in paragraph 11 are consistent with the facts of this case.  While this paragraph permits both the USAO and defendant to submit full and complete factual information to the United States Probation and Pretrial Services Office and the Court, even if that factual information may be viewed as inconsistent with the facts agreed to in this agreement, this paragraph does not affect defendant's and the USAO's obligations not to contest the facts agreed to in this agreement.

24.  Defendant understands that even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions different from those agreed to, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty plea, and defendant will remain bound to fulfill all defendant's obligations under this agreement.  Defendant understands that no one -- not the prosecutor, defendant's attorney, or the Court -- can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be within the statutory maximum.

<u>NO ADDITIONAL AGREEMENTS</u>

25.  Defendant understands that, except as set forth herein, there are no promises, understandings, or agreements between the USAO and defendant or defendant's attorney, and that no additional

25

1  promise, understanding, or agreement may be entered into unless in a

2  writing signed by all parties or on the record in court.

3  ///

4  ///

1        PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

2        26.   The parties agree that this agreement will be considered

3    part of the record of defendant's guilty plea hearing as if the

4    entire agreement had been read into the record of the proceeding.

5    AGREED AND ACCEPTED

6    UNITED STATES ATTORNEY'S OFFICE
     FOR THE CENTRAL DISTRICT OF
7    CALIFORNIA

8    TRACY L. WILKISON
     Acting United States Attorney

9

10                                           March 29, 2021

     ERIK M. SILBER                          Date
11   AMANDA M. BETTINELLI
     Assistant United States Attorneys
12
                                             3-15-2021
13   ATANACIO VILLEGAS                       Date
     Defendant
14
                                             3-29-2021
15   KIRT HOPSON                             Date
     Attorney for Defendant

16

17                      CERTIFICATION OF DEFENDANT

18       I have read this agreement in its entirety.  I have had enough

19   time to review and consider this agreement, and I have carefully and

20   thoroughly discussed every part of it with my attorney.  I understand

21   the terms of this agreement, and I voluntarily agree to those terms.

22   I have discussed the evidence with my attorney, and my attorney has

23   advised me of my rights, of possible pretrial motions that might be

24   filed, of possible defenses that might be asserted either prior to or

25   at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a),

26   of relevant Sentencing Guidelines provisions, and of the consequences

27   of entering into this agreement.  No promises, inducements, or

28   representations of any kind have been made to me other than those

                                    27

1  contained in this agreement.  No one has threatened or forced me in

2  any way to enter into this agreement.  I am satisfied with the

3  representation of my attorney in this matter, and I am pleading

4  guilty because I am guilty of the charge and wish to take advantage

5  of the promises set forth in this agreement, and not for any other

6  reason.

7                                                  3-15-2021

8  _____      _____
   ATANACIO VILLEGAS                        Date
9  Defendant

10              CERTIFICATION OF DEFENDANT'S ATTORNEY

11        I am ATANACIO VILLEGAS' attorney.  I have carefully and

12  thoroughly discussed every part of this agreement with my client.

13  Further, I have fully advised my client of his rights, of possible

14  pretrial motions that might be filed, of possible defenses that might

15  be asserted either prior to or at trial, of the sentencing factors

16  set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines

17  provisions, and of the consequences of entering into this agreement.

18  To my knowledge: no promises, inducements, or representations of any

19  kind have been made to my client other than those contained in this

20  agreement; no one has threatened or forced my client in any way to

21  enter into this agreement; my client's decision to enter into this

22  agreement is an informed and voluntary one; and the factual basis set

23  forth in this agreement is sufficient to support my client's entry of

24  a guilty plea pursuant to this agreement.

25                                                  3-29-2021

26  _____      _____
   KIRT HOPSON                              Date
27  Attorney for Defendant

28

                              28